| STATE OF LOUISIANA | * | NO. 2025-KA-0526 |
| VERSUS | * | COURT OF APPEAL |
| DON C. WOODS | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 561-506, SECTION "B"
Honorable Tracey Flemings-Davillier, Judge
\* \* \* \* \* \*
**Judge Rachael D. Johnson**
\* \* \* \* \* \*
(Court composed of Judge Sandra Cabrina Jenkins, Judge Rachael D. Johnson,
Judge Karen K. Herman)

Jason R. Williams
DISTRICT ATTORNEY
Brad Scott
CHIEF OF APPEALS
Peter Veich
ASSISTANT DISTRICT ATTORNEY
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 South White Street
New Orleans, LA 70119

      COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Christopher A. Aberle
LOUISIANA APPELLATE PROJECT
P.O. Box 8583
Mandeville, LA 70470-8583

      COUNSEL FOR DEFENDANT/APPELLANT

                           **AFFIRMED
MARCH 19, 2026**

Appellant, Defendant Don C. Woods, seeks review of his March 19, 2025 obstruction of justice conviction. Finding no error, we affirm Defendant's conviction.

## PROCEDURAL HISTORY

Defendant was indicted by a grand jury on April 11, 2024, on one count of second degree murder in violation of La. Rev. Stat. 14:30.1, and one count of obstruction of justice, in violation of La. Rev. Stat. 14:130.1. Defendant entered pleas of not guilty to both counts.

The following year, the matter proceeded to a jury trial where Defendant was found guilty of obstruction of justice on March 19, 2025. However, the jury was unable to reach a verdict as to the second degree murder charge. Therefore, the district court declared a mistrial on that charge.

Thereafter, the matter was re-set for trial on the remaining second degree murder charge. At an April 24, 2025 pre-trial conference, the parties entered into a plea agreement wherein Defendant entered a guilty plea to the amended charge of manslaughter. On that same date, Defendant waived all sentencing delays and the

1

district court sentenced him to concurrently-running 10-year terms of imprisonment at the Louisiana Department of Corrections in connection with his manslaughter and obstruction of justice convictions.

This timely appeal followed. Defendant's sole assignment of error is that the district court erred in convicting him of obstruction of justice.

## FACTS

At trial, the State introduced three 911 calls, New Orleans Police Department ("NOPD") Officer Beverly Ashe's body camera footage, Delvin Bickham's home surveillance video and a bystander's cell-phone video. The State also introduced seven witnesses: Off. Ashe, Detective Stephanie Gray; Dr. Cynthia Gardner; Louisiana State Police Sergeant Jack Uhle; former NOPD Detective Joshua Fontenot; nearby neighbors Jason Adams and Mr. Bickham.

Defendant called four witnesses to testify: neighbor Jennifer Green McDaniel; co-worker Ken Hamrick; his brother-in-law Patrick Emmanuel Smith; Sr., and his wife Pamela Smith Woods. Defendant also testified at trial.

The Prosecution

*911 Calls*

The State introduced the audio of four 911 calls that were played at trial. The first caller reported that following an altercation a homeless man had been stabbed by a man who fled the scene in a white vehicle. The caller stated that she used her cell phone to videotape the incident.

The second caller reported that she heard a woman screaming. When the caller exited her home to see what happened, she saw a man lying bleeding in her driveway. She described the victim as a white, shirtless man wearing blue jeans. She further stated that she believed the victim had been pushing a shopping cart

2

because she observed a cart at the scene. The caller stated that a woman, who was rendering aid to the victim, had purportedly witnessed the incident and could supply the police with more information.

The third caller reported that an ambulance was needed at the scene and gave the location of the incident. The last caller stated that as he passed the intersection of Esplanade Ave. and North Galvez Street, he saw a victim "stabbed up bad," who needed assistance and was "sliced wide" open.

*Nearby Residents: Messrs. Adams and Bickham*

Mr. Adams testified that on April 21, 2021, he heard a woman screaming which prompted him to exit his home. Upon exiting his home, Mr. Adams saw a man with a wound on his side bleeding profusely. However, he did not see the assailant. Mr. Adams provided the NOPD with his home camera footage, which included "two separate clips" from the date of the incident. After Mr. Adams authenticated the clips at trial, they were introduced into evidence as State's exhibits, which the Sate reserved the right to publish at a later time.

Mr. Bickham testified that he lives on North Galvez Street and that he provided the NOPD with his home surveillance video from the date of the incident. He authenticated the video, which was separated into "seven clips" and introduced into evidence. Portions of the footage from Mr. Bickham's home show Defendant exiting a white truck to confront the victim, who raised his fists in anticipation of an altercation. It appears that prior to Defendant exiting his vehicle, Defendant narrowly missed hitting the victim with his truck.

During their brawl, Defendant fell to the ground where the victim proceeded to punch the Defendant. Afterwards the victim walked away from Defendant, who then followed the victim. The footage shows that Defendant retrieved a sheathed

3

sword from the victim's shopping cart and swung it at the victim. The sheath fell off the sword and Defendant struck the victim with the blade. Defendant walked back to his truck holding the sword, and drove away.

After Defendant departed, an eyewitness, whose vehicle was parked behind where the incident occurred, exited her vehicle and appeared to make a phone call before assisting the victim.

*Video of Diamond Pollard*

A video taken by Diamond Pollard, an eyewitness of the victim's murder, was admitted into evidence showing the altercation between the victim and Defendant. The video shows the victim punching Defendant, causing him to fall to the ground. Thereafter, Defendant rises from the ground as the victim backs away, but Defendant approaches him. Thereafter, Defendant grabs an undiscernible object and swings it at the victim. Defendant then swings the object, which at this point in video it can be seen the object is a sword, at the victim again. The victim falls to the ground. Defendant, presumably with the sword, steps out of the range of the video and a white truck can then be seen driving away with the victim lying on the ground bleeding.

*Orleans Parish Coroner's Office*

Dr. Gardener testified that in her capacity as the deputy coroner at the Orleans Parish Coroner's Office, she performed the victim's autopsy. She testified that the victim died as a result of a "chop wound" to the torso.

*Police Investigation*

Det. Gray testified that she was the lead homicide detective in this case.[1] She explained that she obtained the license plate number of the Defendant's white vehicle based on her review of the bystander's video. She conducted a search of the vehicle's license plate number through the Louisiana Department of Motor Vehicles. The search revealed the car was registered to the Defendant.

Det. Gray explained that when Defendant's vehicle was located at the Metairie Country Club, the Defendant was not with the vehicle. She applied for an arrest warrant for the Defendant and search warrant for his residence after comparing Defendant's driver's license photograph with the perpetrator's images on the bystander's video. Both warrants were issued.

Det. Gray testified that Defendant was later arrested at his residence, where she conducted a "short on-scene interview" with him regarding the murder weapon. This interview was video-recorded and entered into evidence at trial. This exhibit shows Defendant being Mirandized following his arrest. Upon confirming that he understood his rights and was willing to be questioned, Defendant was interviewed by Det. Gray. She asked whether the sword was inside Defendant's home. Defendant responded that he discarded the weapon two blocks away from where the incident occurred. As a result, the search warrant for Defendant's residence was not executed.

Off. Ashe was one of the first officers to arrive on the scene. In the course of her investigation, she located Ms. Pollard, who witnessed and videotaped the incident. Ms. Pollard provided the police with her cell-phone video that Off. Ashe

---

[1] Mr. Fontenot testified that he was the initial lead detective on the scene, but his involvement ended when the victim died and the matter became a homicide investigation.

reviewed on the scene. Off. Ashe authenticated the video during her testimony, and it was introduced as an exhibit.

Off. Ashe's body camera footage was also introduced into evidence. Her body camera footage shows upon arriving at the scene, a man and woman were attempting to render aid to the victim. Off. Ashe learns that the woman rendering aid is Ms. Pollard and that she witnessed the incident. Off. Ashe then proceeds to question Ms. Pollard. Ms. Pollard shares that she observed an assailant (Defendant), who she described as a black male in a white truck, almost hit the victim with his vehicle. She observed that the assailant "got upset," and exited his vehicle then the two men began fighting. After fighting, the assailant retrieved a sword from the victim's cart and hit the victim. The assailant then put the sword in his truck and drove away.

Sgt. Uhle testified that he assisted the NOPD with this homicide investigation. He explained that the NOPD needed his assistance with locating the primary suspect and his vehicle. Sgt. Uhle testified that he located Defendant's vehicle in the Metairie Country Club's employee parking lot, leading him to believe Defendant was a country club employee. Sgt. Uhle then applied for an "exigent circumstances location request" to allow law enforcement to use Defendant's cell phone information to locate him. Upon receiving this information, other law enforcement officials apprehended Defendant at his residence. Sgt. Uhle stated that his involvement in the investigation ended at this stage.

Defendant's Case

*Character Testimony*

Ms. McDaniel, Defendant's neighbor, testified that he was known throughout their neighborhood as a "peaceful, super mellow gentle guy."

Mr. Hamrick testified that he and Defendant worked at the Metairie Country Club, where Defendant had a reputation for peacefulness.

Defendant's brother-in-law, Mr. Smith, testified that he has known the Defendant for over 30 years. He described spending time with the Defendant at frequent family gatherings. He further related that Defendant was always spoken highly of and had a stellar reputation.

Mrs. Woods stated that Defendant, her husband, was employed at the Metairie Country Club for 30 years and that he reported to work there on the day of the incident. She testified that those who know the Defendant "consider him [to be a] very peaceful, calm, non-violent person."

*Defendant's Testimony*

Defendant testified that the victim was running in the street with a shopping cart, causing Defendant to slam on his brakes, stop and exit his vehicle to see whether he hit the victim. Upon exiting his vehicle, Defendant stated that the victim assumed "a fighting stance," called Defendant the n-word, and threatened to "cut [Defendant's] head off." Defendant testified that he noticed "something sticking out [of the victim's shopping cart]," which Defendant retrieved from the cart and swung at the victim. Defendant testified that after striking the victim twice, he did not notice the victim falling to the ground or bleeding. Defendant stated, "I just turned and left."

Defendant testified that when he left the scene he took the object he struck the victim with and placed it in his truck. Upon driving away from the scene, Defendant admitted that he threw the murder weapon out of his truck. Defendant testified on cross-examination that he did not remember where he discarded the sword. He explained that after driving away from the murder scene he stopped his

7

truck to retrieve the sword before throwing it "out of [his] truck on the side somewhere."

## ERRORS PATENT

Our review of this matter reveals that there are no errors patent.

## DISCUSSION

Defendant's sole assignment of error on appeal is that the evidence introduced at trial failed to prove he had the specific intent to obstruct justice. We disagree.

Louisiana Revised Statute 14:130.1 defines obstruction of justice, in pertinent part, as follows:

> A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as described in this Section:
>
> (1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
>
> > (a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United State law enforcement officers.

This Court recently set forth how the statutory requirements of La. Rev. Stat. 14:130.1 are met:

> "[T]he knowledge requirement in La. R.S. 14:130.1(A) is met if the perpetrator merely knows that an act 'reasonably may' affect a 'potential' or 'future' criminal proceeding." *State v. Bowie*, 24-0700 (La. App. 4 Cir. 7/1/25), —— So.3d ——, ——, 2025 WL 1806684, at *9 (quoting *State v. Powell*, 15-0218, p. 11 (La. App. 4 Cir. 10/28/15), 179 So.3d 721, 728). "The defendant must also have tampered with evidence 'with the specific intent of distorting the results' of a

8

criminal investigation." *Id*. (quoting La. R.S. 14:130.1(A)(1)). "'Specific intent' is the state of mind that exists when circumstances indicate the offender actively desired prescribed criminal consequences to follow his act." *Id*. (quoting *State v. White*, 24-0385, p. 23 (La. App. 4 Cir. 5/14/25), —— So.3d ——, ——, 2025 WL 1415587, at *12; See also La. R.S. 14:10(1)).

However, "[n]othing beyond 'movement' of the evidence is required by the statute if accompanied by the requisite intent and knowledge." *Id*., 24-0700, —— So.3d at ——, 2025 WL 1806684, at *11. "Further, '[s]pecific intent [to commit obstruction of justice] need not be proven as fact but may be inferred from the circumstances of the transaction and the actions of defendant.'" *Id*., 24-0700, —— So.3d at ——, 2025 WL 1806684, at *9 (quoting *State v. White*, 24-0385, p. 23 (La. App. 4 Cir. 5/14/25), —— So.3d ——, ——, 2025 WL 1415587, at *12). To support a conviction of obstruction of justice the State must prove "more than the mere removal of evidence from a crime scene." *Id*. (quoting *White*, 24-0385, p. 23, —— So.3d at ——, 2025 WL 1415587, at *12).

*State v. Howard*, 25-0133, p. 12-13 (La. App. 4 Cir. 1/8/26), ––So.3d ––, 2026 WL 63164, at * 6. An "investigation need not have been underway at the time of the obstruction for the statute to have been violated—i.e., the obstruction must only be committed with the knowledge that the act reasonably may affect 'an actual or *potential* present, past, or future criminal proceeding.'" *Powell*, 15-0218, p. 12 (La. App. 4 Cir. 10/28/15), 179 So.3d 721, 728 (citing La. Rev. Stat. 14:130.1)(emphasis added) (remaining citations omitted).

Additionally, in evaluating whether evidence is constitutionally sufficient to support a conviction, appellate courts must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 334, 99 S.Ct. 2781, 2797, 61 L.Ed.2d 560 (1979). "The *Jackson* standard applies to all evidence, both direct and circumstantial, to test whether it is sufficient to prove guilt beyond a reasonable doubt to a rational jury."

*State v. Johnson*, 09-0259, p. 7 (La. App. 4 Cir. 9/16/09), 22 So.3d 205, 210 (citations omitted).

The directive that the evidence be viewed "in the light most favorable to the prosecution" requires that deference be made to the trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538, pp. 13-14 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702. The fact finder's discretion will be impinged upon "only to the extent necessary to guarantee the fundamental protection of due process of law." *Johnson*, 09-0259, p. 7, 22 So. 3d at 210 (quoting *State v. Marshall*, 04-3139, p. 5 (La.11/29/06), 943 So.2d 362, 367).

In the instant matter, Ms. Pollard's video depicted Defendant striking the victim with a weapon before leaving the crime scene in his truck. Off. Ashe's bodycam footage further showed Ms. Pollard explaining that she witnessed Defendant leaving the crime scene with the weapon. This was corroborated by Mr. Bickham's surveillance video that also showed Defendant departing the crime scene with the murder weapon. The jury heard NOPD's testimony that the Defendant admitted to discarding the weapon after being Mirandized and questioned. Lastly, the jury observed Defendant testify that he took the weapon with him from the crime scene before discarding it in an unknown location.

The jury could reasonably determine that Defendant had the specific intent to distort the results of a "potential" "future" criminal investigation because Defendant removed and dumped the weapon immediately after the victim's murder and did not admit to doing so until after he was arrested and questioned by the police. The movement of and attempt to conceal evidence is sufficient to establish obstruction of justice. See *Powell*, 15-0218, pp. 11-12 (La. App. 4 Cir. 10/28/15),

10

179 So.3d 721, 728 (holding that a defendant was guilty of obstruction of justice where he relocated a gun from his crime scene and concealed it in a jacket in the back of his closet); *see also State v. Alexander,* 23-0540, p. 17 (La. App. 4 Cir. 4/23/24), 401 So.3d 105,115-16 (upholding an obstruction of justice conviction where the defendant deleted the record of a call he made to a taxi cab company requesting to be transported to the crime scene area and did not admit to placing the call until after the police questioned him and he knew "police would discover where he was and decided to 'come clean'").

Giving deference to the jury's findings in this matter, we find no error in Defendant's conviction for obstruction of justice under the unique facts presented. This assignment of error is meritless.

## DECREE

For the foregoing reasons, we affirm Defendant Don Woods' March 19, 2025 conviction of obstruction of justice.

**AFFIRMED**